CAMILLA BELL SHELBY ET AL., APPELLANTS, V. PLATTE
VALLEY PUBLIC POWER AND IRRIGATION DISTRICT, APPELLEE.
278 N. W. 568

FILED MARCH 25, 1938. No. 30007.

Halligan, Beatty & Halligan and Lowell C. Davis, for appellants.

E. H. Evans and Beeler, Crosby & Baskins, contra.

Heard before ROSE, EBERLY, DAY and CARTER, JJ., and HASTINGS and RINE, District Judges.

RINE, District Judge.

The appellants, Camilla Bell Shelby and A. M. Shelby, brought a suit in the district court for Lincoln county, Nebraska, against the appellee, Platte Valley Public Power and Irrigation District, which will be hereinafter referred to as the District. The District at all times involved in this suit was and is now a corporation duly organized as a public power and irrigation district. It was organized under the laws of this state for the purpose of diverting water from the North Platte river, conveying this water by canals to reservoirs located in Lincoln county, Nebraska, then conveying it to and through a powerhouse located south of North Platte, Nebraska, for the operation of this powerhouse for generating electrical energy for sale, and for the sale of the water so diverted and stored, to water users elsewhere. The District was and is clothed

with the power of eminent domain to acquire land necessary for the improvement for which it was organized.

At all times involved in this suit prior to March 26, 1935, the Shelbys were the owners as tenants in common of a tract of land lying immediately north of the property upon which the powerhouse of the District is located. This tract of land which was owned by the Shelbys is three-quarters of a mile in width from east to west and one mile in length from north to south. The Shelbys still claim to be the owners of this land. Diagonally across this Shelby land a large canal was constructed by the District. This canal is referred to in the record as a tailrace and we will so refer to it herein. The District entered upon the Shelby land and commenced the construction of this tailrace on March 26, 1935. This tailrace was a necessary part of the improvement for which the District was organized, and it was necessary in making this improvement to cross this land, although it was not essential to the improvement that it should be located at the exact place where it was constructed.

The Shelbys in their amended petition allege that at the time the District went upon their land and constructed this tailrace it had neither purchased nor condemned the land over which the tailrace was constructed, and has not done so since that time; that in constructing this tailrace the District committed an unlawful trespass to their great damage; that the District possesses the power of eminent domain, under which this land can be acquired by the District for the construction and use of this tailrace; that by reason of an arrangement with the United States government, which has been financing this improvement, the property of the District, including its future income, has been encumbered to such an extent that there are no available assets of the District out of which a judgment could be satisfied should one be obtained by them against the District; that unless the District is restrained from entering upon their property the District will go thereon and cause irreparable damage thereto and refuse to pay

them the damages caused thereby; that they have no adequate remedy except injunction, for which reason they are entitled to an injunction enjoining defendants from going upon their said property until the District has either purchased the land in question or has condemned it for the District's use under the laws of the state of Nebraska. In their amended petition the Shelbys pray for an injunction against the District enjoining it from entering upon any part of their land until the District shall have purchased or condemned the land used by the District for its tailrace.

The District filed an amended answer, wherein it alleges that it went upon the Shelby land and has completed the tailrace by virtue of a contract with the Shelbys whereby it was authorized to enter upon this land and construct this tailrace for the agreed sum of $7,400 to be paid by the District to the Shelbys; that the District has offered to pay the Shelbys said agreed sum of $7,400, which sum they have refused to accept; that the Shelbys had full knowledge of the fact that the District had entered upon their land and was constructing the tailrace thereon for some time prior to the institution of this suit, and with such knowledge they made and executed a deed of conveyance to the District of the right of way in question, sent the same by mail to their authorized agent at North Platte, Nebraska, with instructions to deliver the same to the District, and thereby ratified and affirmed the contract and the authority of the District to go upon their land and construct a tailrace across the same; that the District has expended large sums of money in the construction of said tailrace, and that the Shelbys by such acts of ratification and acquiescence are estopped from changing their position to the great detriment and injury of the District, and are estopped from asserting that they had not consented to the District going upon their land and constructing the tailrace across the same, and are estopped from denying that Coufal & Shaw, who in their name executed the contract in question, had no authority

35 of 7,400 for 357

357

to enter into said contract for and in their behalf, and are thereby estopped from asking that an injunction issue restraining the District from remaining upon said land and using said tailrace it has constructed over the same, which, if issued, would be a great injury to the District; that the District has a right to go upon the premises in question to construct its works and carry on its work, and any interference by the Shelbys by whatever means or by an injunction issued in this suit would prevent the District from using this tailrace as an outlet for its waters and would prevent the District from using all of its constructed works for the purpose of manufacturing, selling and disposing of electric power and to irrigate lands situated below the outlet of the tailrace, and would work irreparable injury to the District and the persons with whom the District has entered into contracts to furnish water and power. The District denies the allegation of the Shelbys that it has no assets available to satisfy a judgment that might be secured against it, and alleges that ample funds will be available to pay any judgment that the Shelbys may secure in the matter. The District further alleges that it at no time wilfully or maliciously trespassed upon the Shelby land or continued to trespass thereon, but at all times depended in good faith upon the provisions of said contract in entering upon and constructing said tailrace, and that at all times it has been ready, willing and able to pay said sum of $7,400, agreed upon to the Shelbys, and has tendered to them said sum of money as a consideration for entering upon their land and constructing said tailrace, and is still ready, willing and able to pay said sum so fixed as a consideration for entering upon their land and constructing said tailrace, and has deposited with the trial court by placing in the hands of its clerk the sum of $7,400 for the use and benefit of the Shelbys, and offers same to the Shelbys in payment of the contract price. In its amended answer the District prays that relief asked for by the Shelbys in their amended petition be denied and that their amended petition be dismissed.

The District filed a separate cross-petition asking for affirmative relief against the Shelbys, wherein it alleges and states that on February 27, 1935, the Shelbys, being then the joint owners of the land in controversy, which land is described by metes and bounds, on that date sold said land to the District to use the same for the construction of this tailrace, and that the Shelbys and the District entered into an agreement in writing in relation thereto, a copy of which is set out in the cross-petition. This alleged agreement is a contract between the Shelbys on the one part and the District on the other, in which it is stated that, in consideration of the payment of $7,400 by the District to the Shelbys and the conditions contained in the agreement to be kept and performed by the District, the Shelbys agree to sell and convey to the District by warranty deed the land therein described. This agreement bears date of February 27, 1935. It purports to be executed on behalf of the District by "W. E. Frank, its duly authorized agent," and on behalf of the Shelbys by "Coufal & Shaw, their attys." It is further alleged and stated by the District in said cross-petition that shortly after March 7, 1935, and at various times since, the District tendered to the Shelbys said sum of $7,400 and requested them to convey to the District the premises described in the agreement, and that they made and executed such a conveyance as provided for in said agreement and transmitted the same by mail to their agent at North Platte, Nebraska, with instructions to deliver the same to the District and receive the sum of $7,400 for and on their behalf, but that said agent refused to comply with these instructions and failed to deliver said deed of conveyance and did not take the payment provided for in said contract, and since that time the Shelbys have refused and still refuse to deliver such conveyance; that the District has deposited with the court the sum of $7,400 for the use and benefit of the Shelbys, and that it now offers said sum to the Shelbys in payment of the contract price; that the District has duly performed all conditions of this agreement on its

part to be performed, and stands ready, willing and able to pay said sum of money to the Shelbys whenever they comply with their part of the agreement; that the Shelbys through and by their duly authorized agents had full knowledge of the fact that the District had entered upon their land and was engaged in constructing its works over and across the same, and with such knowledge made and executed a good and sufficient deed of conveyance to the District of the right of way over and across said land, and sent the same by mail to their duly authorized agent with instructions to deliver the same to the District, and thereby ratified and affirmed said agreement and the authority of the District to go upon said land and construct its works over and across the same and expend large sums of money for said works, and that the Shelbys by such acts of ratification and acquiescence are now estopped from changing their position to the great detriment and injury of the District, and estopped from asserting that they have not consented to the District going upon said land and constructing said works over and across the same, and are estopped from asserting that Coufal & Shaw had no authority, as their agents, to enter into said agreement, and are estopped by their ratification of the execution of said contract from asking that injunction issue restraining the District from remaining upon the land and using the tailrace it has constructed over and across the same, which injunction, if granted, would be of great and irreparable injury to the District. The District in its cross-petition prays that the Shelbys be required to receive said sum of $7,400 so tendered and either deliver the conveyance already executed by them or make, execute and deliver to the District another deed of said premises, and for such other and further relief as justice and equity may require.

The Shelbys in a single pleading filed a reply to the District's answer, and an answer to the District's cross-petition. In this pleading they deny that they ever entered into a contract of sale for any part of their land, and allege and say that Coufal & Shaw were attorneys

employed by them for the purpose of investigating and reporting to them the nature and extent of the property desired by the District; that M. A. Shaw of that firm had no authority, express or implied, to enter into any contract with the District for the sale of any of their land; that the agreement set forth in the District's cross-petition was signed by Coufal & Shaw without authority from them, and that said contracts were forwarded to them and that they forthwith repudiated the action of said Coufal & Shaw and refused to execute said contracts or affirm the same, and have at all times since disapproved the action of said attorneys and have never ratified said action. They further allege that the provisions of said agreement purporting to be signed by said attorneys were unknown to them, and such provisions were never ratified by them and have at all times been repudiated by them; and that the action of said firm of attorneys in signing said contract has at all times been repudiated by them, and that said agreement executed by Coufal & Shaw was void and unenforceable by virtue of the statute of frauds of the state of Nebraska. In this pleading the Shelbys pray for an injunction against the District and for damages as prayed for in the amended petition, and for further equitable relief.

The trial court denied the injunction prayed for, set aside and vacated a temporary injunction granted to the Shelbys on June 29, 1935, but which had never been in effect because the requisite bond had never been furnished, dismissed plaintiff's petition, and on the District's cross-petition decreed specific performance of the contract of purchase entered into between the Shelbys through Coufal & Shaw and the District. From that decree this is an appeal. The Shelbys also appeal from the order of the trial court overruling their motion for a new trial.

The facts and circumstances out of which this suit arose, so far as important here, are as follows:

Early in January, 1935, the improvement being made by the District had about reached the tailrace below the

powerhouse and it became necessary for the District to acquire a right of way across the Shelby land to construct this tailrace.

For many years prior to this time O. H. Thoelecke of North Platte, Nebraska, had represented the Shelbys in managing and renting their land; the Shelbys being residents of California. About this time the District employed Mr. Thoelecke as one of its land appraisers. Upon being so employed Mr. Thoelecke and the Shelbys professedly selected an employee of Mr. Thoelecke, one L. E. Mehlmann, to act as the Shelbys' agent at North Platte, Nebraska; however, the record shows that, while this was apparently the situation, the fact was that all of the correspondence in reference to this matter between the Shelbys and their represntatives in North Platte was placed in a drawer in Mr. Thoelecke's office, to which he had access, that part of this correspondence was personally conducted by Mr. Thoelecke, that he was in touch with the Shelbys during all of the time that he was an appraiser for the District, that while he was an appraiser for the District he disclosed to the Shelbys confidential information which he acquired as such appraiser relative to the tentative appraisement the District had made of the Shelby land sought to be acquired for the tailrace, of which information the Shelbys availed themselves, and that after he was dismissed by the District he again took full charge of the Shelby interests at North Platte.

About the time that the District determined to take action to secure this right of way over the Shelby land, Mr. Thoelecke and Mr. Mehlmann took up that matter by correspondence with the Shelbys, and thereafter numerous letters, telegrams and telephone conversations passed between them and the Shelbys about the sale of land for this right of way to the District and as to other matters incident to the construction of the tail race. This, as well as correspondence dealing with this matter had by the Shelbys with their representatives located elsewhere in Nebraska, was carried on from California on behalf of the

Shelbys either by Mr. Shelby, Mrs. Shelby, or by Jesse Bell, a brother of Mrs. Shelby, with full knowledge had by all three of these parties of what was being done by each one.

At this time the Shelbys decided to employ attorneys who were not located at North Platte, and about the middle of January, 1935, they employed the law firm of Coufal & Shaw of David City, Nebraska, to negotiate with the District relative to the District acquiring the right of way over their land. Shortly after this employment the firm sent Mr. Shaw of the firm to North Platte to investigate the situation. Mr. Shaw made a thorough investigation and by letter of date January 29, 1935, reported fully upon what he had found. In this letter he gave the exact description of the land proposed to be taken; this is the land which is the subject of this controversy. From this time on the Shelbys were aware of the exact land the District was seeking to secure for this tailrace. This firm of attorneys for a considerable period of time negotiated with the officers of the District about this matter. In these negotiations numerous questions were raised and considered, including what amount of money the Shelbys should be paid for land taken or damaged in the construction of this tailrace, the way the land should be left when the improvement had been completed, the question of fencing this land after the improvement had been made, siphoning the slough under the tailrace which ran across the Shelby land, and as to whether or not a bridge should be constructed by the District over the tailrace. The result of these negotiations and the position taken by the District were reported by these attorneys to the Shelbys from time to time as they occurred.

About February 16, 1935, the Shelbys were advised by their attorneys that it was extremely important to the District that it should have possession of this land at an early date, and that unless a settlement was made at once the District would proceed to condemn this land. The need for immediate possession arose because of the fact that

it was necessary to dig at least a part of the tailrace to dispose of the water that had accumulated above the tailrace before the District could proceed with the construction of the improvement.

Prior to this time, on January 24, 1935, the District had entered into a contract with its contractor to construct this tailrace under plans and specifications which had theretofore been adopted by the District. This contract contained a time limit within which the contract was to be completed and subjected the contractor to penalties for failure to complete the contract within the time specified. This was a further reason why the District wanted early possession of the land.

On February 23, 1935, Coufal & Shaw wired the Shelbys that the District would settle for $7,200, conditions same. What those conditions were are set out in the letter of confirmation written by the attorneys to the Shelbys as follows: "The contracts are conditioned they will furnish and maintain the fence, and they will not interfere with the natural flow of Fremont slough but will take care of the same by syphon."

On February 24, 1935, the Shelbys sent a telegram to their attorneys authorizing them to settle upon the basis indicated. This telegram is as follows: "Will accept seventy-two hundred if absolutely necessary but get your fee above this amount if possible." This telegram was signed by Mr. Bell, but it was directed to be sent by Mrs. Shelby and the action taken was known to Mr. Shelby. Upon receiving this authority to settle, these attorneys, on February 25, 1935, by telegram, advised the District that they could close this matter for $7,200 plus their attorney fees. A few days later Mr. Frank, who was the officer of the District having charge of securing the right of way for the District, called up Mr. Shaw by telephone, and after negotiating about the matter, Mr. Frank on behalf of the District and Mr. Shaw on behalf of the Shelbys arrived at the agreement embodied in the contract of sale. Whereupon the attorneys for the Shelbys prepared duplicate

copies of this contract of sale, executed the same on behalf of the Shelbys, and forwarded them to the District on February 28, 1935. On the same day these attorneys wrote a letter to the Shelbys advising them that they had entered into a contract with the District for $7,400, in line with the authority they had received, and that they would forward deed for signature within the next few days. Shortly thereafter these contracts were returned to the attorney duly executed by the District.

On March 8, 1935, these attorneys forwarded to the Shelbys duplicate executed copies of this contract of sale and a warranty deed conveying the land in controversy to the District, and requested the Shelbys to execute the warranty deed, acknowledge the execution of the contracts and to return the deed and one copy of this contract to them. On March 9, 1935, these attorneys wrote the auditor of the District advising him that pursuant to his request they forwarded the deed and duplicate copies of the contract to the Shelbys for execution and acknowledgment, and on the same day they advised the attorney for the District to the same effect. The contract in question provides that, in consideration of the payment of $7,400 by the District to the Shelbys and the conditions contained in the contract to be kept and performed by the District, the Shelbys agreed to sell and convey to the District by warranty deed the land involved in this suit. These duplicate copies of the contract and the warranty deed transmitted to the Shelbys contained all the conditions insisted upon by the Shelbys up to the time they authorized their attorneys to sell the land involved for $7,400.

Some time after the contract and deed had been forwarded to the Shelbys they wrote to their attorneys complaining that the contract did not protect them from damages they might sustain because of seepage, although at no time prior thereto had they insisted upon such a provision as a condition of settlement. In this letter they returned the two copies of the contract unsigned but retained the warranty deed that had been forwarded to them.

On March 25, 1935, the Shelbys again wired their attorneys stating that the contract should contain a clause covering any future damages that might arise due to seepage, and then stated in this telegram "but rather than have further litigation will settle for $7,400.00." Finally, when on May 27, 1935, Coufal & Shaw sent the Shelbys a telegram advising that the District was willing to include in the contract and in the deed a provision that they should not be barred from collecting future damages from seepage, they forthwith discharged them from further service and advised them that they were not interested in having such a provision inserted in the deed and contract.

In the circumstances we have outlined the District went upon the land and constructed this tailrace without condemning the land over which it runs and which is essential to its operation, and began piling some dirt upon the south end of the land early in March, 1935, and on March 26, 1935, it entered the north end of this land, placed a drag-line thereon and proceeded to construct this tailrace which was completed at the time of the trial of this case. The record shows that the District did all things necessary to be done to carry out its contract of purchase, that the price agreed upon to be paid was available on and after March 8, 1935, and that that sum was thereafter tendered to the Shelbys, which tender has been kept good at all times since.

The warranty deed conveying the land in controversy to the District which had been sent to the Shelbys by their attorneys was executed by the Shelbys in due form on the 1st day of May, 1935, and on the following day transmitted to Mr. Mehlmann with directions to check the descriptions therein contained and to deliver the deed to the District or to the attorneys at Bellwood. This was not done by Mr. Mehlmann, who gives as a reason for not doing so that he did not know the attorneys at Bellwood. He retained possession of the deed until this suit was brought when he turned it over to the present attorney of the Shelbys. Unfortunately the letter whereby the Shelbys

transmitted this deed to Mr. Mehlmann has not been produced—neither the original nor the copy, both seem to have been lost—and the court must reply upon Mr. Mehlmann's memory as to what instructions it contained.

The trial court found, and the record sustains its finding, that the employment of Coufal & Shaw, by the Shelbys, did not contemplate power in Coufal & Shaw, or either of them, to execute the contract of sale on behalf of the Shelbys and that Coufal & Shaw were without proper written authority from the Shelbys to execute the contract of sale herein involved, and that at the time of the execution thereof the same was not binding upon the Shelbys; that the Shelbys became aware of the execution of this contract of sale as entered into by Coufal & Shaw and were, on or about February 28, 1935, fully apprised of the contents thereof, and received from Coufal & Shaw the duplicate originals of said contract of sale, receiving same on or before March 10, 1935, and thereby became advised and informed as to all the provisions contained therein; that one L. E. Mehlmann gave to the Shelbys in the early part of April, 1935, actual knowledge of the fact that the District had entered into possession of said land and was constructing its ditch thereon.

In its decree the trial court ordered specific performance of the contract of sale. Among other things the trial court found that, under all of the circumstances as disclosed from the evidence, the Shelbys are estopped to deny that they had ratified the acts of Coufal & Shaw in the execution and signing of said contract of sale, and that the acts and omissions of the Shelbys, under all of the circumstances, as shown in this case, works an estoppel *in pais* as against the Shelbys in such manner as to effect and to cause the execution of said instrument and agreement of sale to be ratified by operation of law, and to cause such instrument to express a contract binding upon the Shelbys and upon the District and that the District is entitled to a decree for specific performance of said contract of sale. The trial court also found "that between the dates of

March 10, 1935, and May 27, 1935, the defendant District constructed a large ditch upon and across the lands described in said agreement of sale at great expense to said District and did and perform such work that would subject the defendant District to large damages in the event that it had no right upon said lands." There is no evidence in the record to justify this last finding. Unless there is such evidence or other evidence to sustain a finding that the District has suffered substantial injury because of the conduct of the Shelbys then this decree of specific performance cannot be sustained upon the ground of estoppel. It is a well-established principle of law that before a party can avail himself of estoppel because of the wrongful conduct of another it must clearly appear that he has suffered substantial injury or damage because of such conduct. *Haschenberger v. Dennis,* 118 Neb. 411, 225 N. W. 25; *Commercial Investment Corporation v. Farmers State Bank,* 118 Neb. 678, 225 N. W. 758; *Rea v. Pierson,* 114 Neb. 173, 206 N. W. 760; *First Nat. Bank v. First Nat. Bank,* 111 Neb. 441, 196 N. W. 691. The contract for the construction of this tailrace was entered into and the location of this tailrace was fixed and determined before any negotiations took place between the Shelbys and the District. It is idle to say that the District suffered substantial injury by the conduct of the Shelbys because of being deprived of the privilege of changing the course of this tailrace and locating it upon some other land. There is not a particle of evidence in the record to show that this tailrace could have been constructed more cheaply elsewhere, and it affirmatively appears from the record that to construct this tailrace at any other place would have caused the District greater expense. Furthermore, the District could have instituted condemnation proceedings to acquire the land under the power of eminent domain. That is what the Shelbys asked for. The trial court in this case entered a temporary injunction enjoining and restraining the District from going upon that land until it instituted proper and regular condemnation pro-

ceedings in the county court of Lincoln county, Nebraska, to secure title to such part of the Shelby premises as is necessary for the construction of the works of the District, and that, upon the institution of such condemnation proceedings, the injunction be suspended and the District permitted to proceed with the construction of the tailrace so long as such condemnation proceedings were diligently prosecuted and carried out and the condemnation money awarded paid the Shelbys or deposited with the county court of Lincoln county, Nebraska, as provided by law. However, the District objected to proceeding by condemnation which was thus made available to it and secured the dissolution of the temporary injunction. Had it proceeded along this line at that time, the District could in no way have suffered any substantial injury because of the conduct of the Shelbys. In such circumstances the District cannot now be heard to say that it is entitled to the specific performance of the contract of sale made by Coufal & Shaw upon the ground of estoppel.

The District also urges that it is entitled to a decree for specific performance on the ground that this contract of sale was ratified and approved by the Shelbys. This claimed ratification is based upon the following grounds: (1) Through the chain of correspondence to which the name of the Shelbys, or one of them, was subscribed; (2) by execution and delivery of the deed; (3) that ratification may be construed to have been had from the silence and acquiescence of the Shelbys under the circumstances; (4) that such ratification be determined as a matter of law to have been effected by reason of the estoppel of the Shelbys to deny such. The trial court was clearly right in refusing to grant specific performance upon any ground of ratification. The first contention made is not borne out by the record; no correspondence found in the record justifies this claim. Contentions 3 and 4 are without merit for the reason that no substantial injuries were shown to have been suffered by the District because of the conduct of the Shelbys. We have already touched upon that phase

of the law. Contention number 2 is based upon the claim that ratification took place by the execution and delivery of the deed. This deed was delivered to the agent of the Shelbys at North Platte and it could be recalled at any time before it was delivered to the District. This was done, and when the deed was returned to the Shelbys it became a nullity for all purposes of this case. See *Jobse v. United States Nat. Bank,* 142 Or. 692, 21 Pac. (2d) 221, wherein it was said: "Delivery is an indispensable requisite to the validity of a deed. So long as the grantor retains the legal control of an instrument, title under it cannot pass any more than if he had not signed it. To pass the title the grantor must give up dominion and control of the deed. He must part not only with the possession of the deed, but also with the right to recall it or to alter any of its provisions."

Under the record in this case the Shelbys are not entitled to any relief in a court of equity. The trial court was right in dismissing their petition. 1 Pomeroy, Equity Jurisprudence (3d ed.) sec. 404, lays down the law applicable here: "It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience." This court in *Blondel v. Bolander,* 80 Neb. 531, 114 N. W. 574, approved the following rule of law laid down in 1 Pomeroy, Equity Jurisprudence (3d ed.) sec. 397: "Whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." In *Deweese v. Reinhard,* 165 U. S. 386, the rule is announced as follows: "A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice,

then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity." The Missouri court dealing with the same question held in *Creamer v. Bivert*, 214 Mo. 473, 113 S. W. 1118: "The maxim that he who comes into equity must come with clean hands is a cardinal one. It touches to the quick the dignity of a court of conscience itself. Hence, its application does not depend upon the averments of the pleadings, or the wish of counsel, but it may be invoked and applied, *ex mero motu*, by the court."

The Shelbys petition a court of equity to compel the District to acquire the land it needs for its tailrace, through the exercise of the power of eminent domain. The District resisted this action, claiming to have acquired this land through purchase, and prayed for and secured from the trial court a decree for the specific performance of the contract of sale. This contract has now been held unenforceable, and unless some provision is made by this court, the District may find itself deprived of the right to acquire this property through condemnation proceedings and at the same time be confronted with an action for damages for a large sum of money, the effect of which would be that the Shelbys, by the action of this court, would benefit through their own misconduct. To prevent injustice, and to prevent this happening, and to the end that equity and justice be done, the district court for Lincoln county, Nebraska, is directed to enter an order, if application is made therefor by the District, which is the appellee herein, within 10 days of the time the mandate of this court is filed with the clerk of said district court, to enjoin Camilla Bell Shelby and A. M. Shelby, the appellants herein, from instituting an action for damages, such injunction to be conditioned that the District proceeds at once to institute proper and regular condemnation proceedings in the county court of Lincoln county, Nebraska, to secure the title to such of plaintiffs' land as is necessary for the construction and operation of the works of appellee, and such injunction

to remain in force so long and only so long as such condemnation proceedings are diligently prosecuted and carried out, and the condemnation money awarded the plaintiff deposited with the clerk of the county court of Lincoln county, Nebraska, as provided by law.

For the reasons stated in this opinion, the judgment of the district court is reversed, with directions that judgment be entered by the trial court in conformity with this opinion.

REVERSED.